## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:                                           BANKRUPTCY NO.
                                                 06-10413

**NEW ORLEANS PADDLEWHEELS, INC.**

                                                 SECTION "A"

**DEBTOR**

                                                 CHAPTER 11

### REASONS FOR APPOINTING A CHAPTER 11 TRUSTEE

This matter came before this Court on Wednesday, September 6, 2006 and Monday,

September 18, 2006, as a hearing on the Warren L. Reuther, Jr.'s Motion to Appoint Chapter

11 Trustee or Examiner (**P-114**) and the City of New Orleans' Motion to Appoint Chapter 11

Trustee or Examiner (**P-127**).

Present:

Kirk Reasonover
Randall Smith
Attorneys for Warren L. Reuther

David Waguespack
Ben Slater
Attorneys for Whitney National Bank

Albert Derbes, III (9/18/06 hearing)
Albert Derbes, IV (9/06/06 hearing)
Attorneys for Unsecured Creditors' Committee

Blake Jones
Robert Ellis
Attorneys for the City of New Orleans

Stewart F. Peck
Benjamin W. Kadden
Attorneys for the Debtor

Warren L. Reuther, Jr. and the City of New Orleans filed Motions to Appoint a

Chapter 11 Trustee or Examiner with Extended Power in the above captioned case;

1

withdrawn at trial were additional requests for conversion to Chapter 7. Reuther asserts malfeasance by debtor's existing management, James Smith, Jr., that the corporate governance over the debtor is impossible because of deadlock, and therefore a plan of reorganization cannot be formulated or approved for presentation to the court and creditors. The City of New Orleans filed a supporting motion adopting the allegations in Warren L. Reuther, Jr.'s Motion. The Debtor filed a combined Objection to both motions.

## Jurisdiction

This Court has Jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C.§ 1104.

## Background

The debtor, New Orleans Paddlewheels, Inc. ("NOP"), is a Louisiana corporation formed in 1982. When incorporated, James E. Smith, Sr. ("Smith") and Warren L. Reuther, Jr. ("Reuther") were its only shareholders, with each holding fifty percent (50%) of the shares outstanding. Smith and Reuther were the captains of a sprawling enterprise of companies in the tourism or hospitality business, an industry burgeoning in New Orleans (collectively the "Hospitality Companies").[1] Reuther was the member of this team involved in the day to day operations of the companies, including NOP. Smith, a long time businessman in the maritime industry, lent his contacts and expertise in the maritime field to the enterprise. By all indications, it was a successful business venture and friendship.

As time wore on, Smith began to look to the future, transferring a large portion of his stock to his five sons. Reuther remained at the helm of his interests, retaining all but one

---

[1] The Hospitality Companies were comprised of  Airport Holdings, Inc., Airport Shuttle Colorado, Inc., Bayou Sauvage Swamp Tours, Ltd., Chicory Building, Inc., Delta Transit, Inc., Destination Management, Inc., Hospitality Enterprises, Inc., Lodging, Inc., New Orleans International Terminal, Inc., New Orleans Paddlewheels, Inc., New Orleans Tours, Inc., New Orleans Tours and Convention Services, Inc., On The Town, Inc., RSC Management, Inc., River Rose Boat Company, Inc., Vermillion Queen, Inc., and Visitor Marketing, Inc.

percent (1%) of his original holdings. This percentage he transferred to his two sons, Warren L. Reuther, III and Robert Reuther, equally.

Beginning in at least 1982, the Hospitality Companies employed, as their corporate counsel, Smith's son, James E. Smith, Jr. ("JES"). It was JES who drafted the Articles of Incorporation and Bylaws for NOP[2] and it was JES, or his law firm, who represented the Hospitality Companies in all legal matters including corporate administration, contractual issues, and litigation.

Recognizing Smith's desire to involve his children in the business more directly, in the 1990s the two men began including Smith's sons as officers in the Hospitality Companies. Initially, this involved electing Duane Smith as president of NOP.[3] Tensions mounted, however, between the two men and in 1999 JES approached Reuther about a shift in management. JES laid out a plan for the both of them to spearhead the Hospitality Companies. JES proposed himself as president, in charge of the day to day operations of the company, with Reuther as its Chief Executive Officer, the "visionary," in charge of marketing and development.[4] At a momentous directors' meeting for the Hospitality Companies conducted in January of 1999, the two families joined once again in an agreement for joint and shared responsibility over management.[5]

The boards of the Hospitality Companies, composed of Reuther, JES, Craig Smith and Nancy Reuther, Reuther's wife, elected Reuther chairman of the board, JES president, and Craig Smith secretary/ treasurer. A certificate of incumbency for NOP, executed by

_____

[2] Wednesday, September 6th Transcript ("Tr.T.") at 73-74.

[3] Reuther Exhibit ("WLR Exh") 3.3. By the same vote of the board, Craig Smith was elected secretary.

[4] WLR Exh. 6.5.

5 WLR Exh. 3.9.

Craig Smith as secretary, confirms this election, as well as Reuther's position as Chief Executive Officer ("CEO").[6]

But this was to be a short respite.  Over the next few years animosities developed and strengthened between Reuther and JES. Nevertheless, Reuther, his wife Nancy, and JES, remained on the boards of the Hospitality Companies from 1999 forward.[7]  Additionally, JES remained as president and Reuther as CEO during this entire period.[8]

The tempest began to roil in 2001, when JES, clearly frustrated by what he perceived as an inappropriate limitation on his ability to manage, began exploring ways to gain control over the Hospitality Companies.[9]  In early 2001, JES requested from his firm an opinion as to the legality of Reuther's position as CEO and the powers of the presidency.[10]

It is worth noting at this juncture, that JES' law firm remained, throughout this period, counsel to the corporations.  Though JES testified that following his election to the position of president in January of 1999 he no longer practiced law, he continued to be the law firm's only owner, was prominently featured on its website as the "managing partner" and as a specialist in business and corporate matters.[11]  JES testified that all the lawyers in

---

[6] WLR Exh. 3.11. Prior to this election, Reuther had been elected CEO of NOP by resolution adopted on November 11, 1995, WLR Exh. 3.2.

[7] Craig Smith was on the boards of the Hospitality Companies in 1999.  WLR Exh. 3.9. In 2000, he was replaced by his father.  WLR Exh. 3.13. The boards of the Hospitality Companies remained unchanged from 2000 forward.  WLR Exh. 3.21, 4.1, 4.3, 4.4.

[8] In February of 2000, the boards of the Hospitality Companies were composed of Reuther, JES, Smith and Nancy Reuther.  Officers of NOP were Reuther, CEO; JES, president; Smith, treasurer; Nancy Reuther, secretary; and Craig Smith, assistant secretary.  WLR Exh. 3.12

[9] Tr.T. at 122, 147.

[10] The contents of that opinion were held by this Court to be privileged, however, the fact that it was requested, was not.  Tr.T. at 120-122.

[11] WLR Exh. 5.3, Tr.T. at 70-72.

4

the firm, including those advising the corporations, were employees under contract.[12]

Presumably, as the sole owner, JES controlled the firm's operations or those who managed.

Whether or not he billed a single hour of legal time, it is clear to this Court that JES

exercised legal control over the firm.

Lawyers in JES' firm attended every shareholder or board of directors' meeting for

the Hospitality Companies over the relevant period.[13]  Frequently at these meetings, legal

opinions were requested of them by shareholders and directors alike and they willingly

complied.  It is also worth a notation that during this same period Reuther employed JES'

firm to perform legal work for him on personal matters.[14]

In October of 2001, JES unilaterally terminated Reuther as CEO and denied him

access to the business offices and records of the Hospitality Companies, literally changing

the locks on the doors.[15]  In perhaps the most honest piece of testimony given by JES, he

explained that through it all, the president would survive, and in the end a court would

decide if he was right.[16]  Truer words were never spoken.

In a board of directors meeting of the Hospitality Companies, held in November of

2001, deadlock ensued.  The lines had been drawn and the directors, Reuther, Smith, JES

and Nancy Reuther, voted along family affiliations on each and every issue.[17]

On December 4, 2001, a board of directors meeting of the Hospitality Companies

was noticed at the request of Reuther.  Its agenda was circulated.  But the morning of the

meeting, JES took the precipitous action of moving for a temporary restraining order from

---

[12]  Tr.T. at 67.
[13]  For example, WLR Exh. 4.2, 3-6; 4.3, 3; 4.4, 3; 4.5, 2.
[14]  WLR Exh. 5.1, 5.2 ; Tr.T. at 63, 265; Monday, September 18 Transcript ("Tr.T2") at 85.
[15]  WLR Exh. 6.20, Tr.T. at 131.
[16]  Tr.T. at 128, 284-285.
[17]  WLR Exh. 4.1.

the Civil District Court for the Parish of Orleans.  The relief was granted, but short lived because on December 14, 2001 the boards of the Hospitality Companies met on the agenda noticed by Reuther.[18]

Having enjoined the boards from meeting on December 4, 2001, JES did hold, on the same day, time, and at the same location as that noticed for the boards of directors meetings, executive committee meetings of the Hospitality Companies.[19]  Under the Bylaws of NOP, the executive committee is composed of the president, vice president, secretary, and treasurer of NOP.[20]  At the time of this meeting, the president was JES, the secretary Nancy Reuther, and the treasurer Smith.  No one held the office of vice president, and Reuther, the company's CEO, was refused participation because he was not specifically named as a member of the executive committee under the Bylaws. [21]

Armed with an unequal balance of power between the Reuther and Smith families, the executive committees attempted to do what could not have been accomplished by the board, or if denied by the board, would have been difficult to overcome.  JES proposed resolution after resolution which passed by the predictable margin of one vote.  JES even proposed amendments to the Bylaws of the Hospitality Companies which were also adopted by the executive committees.[22]

---

[18]  At trial JES did not explain the basis for the temporary restraining order, nor does this Court believe there was a legitimate, legal purpose other than delay.  Tr.T. at 172.   This Court finds that JES delayed the meeting of the boards for the sole purpose of allowing the executive committees of the Hospitality Companies to meet before the boards of these same companies could meet.

[19]   WLR Exh. 4.2.

[20]   WLR Exh. 2, Art. II, sect. 3

[21]   WLR Exh. 4.2.

[22]   WLR Exh. 4.2, 13:11-15:16, 26:11-27:21.  The resolution adopted provided that any vacancy on the board would be filled by vote of those shareholders related to the former director by direct lineage.  Tr.T. at 177.

Throughout this process Reuther and Nancy Reuther were present and objected.[23] First, demanding an explanation as to why the board meeting had been enjoined,[24] and then calling for the conversion of the meeting to those of the boards.[25] Both requests were summarily refused by JES despite the fact that all board members were present at the meeting, the meeting had been properly noticed, and the agenda circulated. An attorney from the JES firm was present and opined that the actions of the executive committee were legal.[26] When Reuther vehemently complained, as a director, to his lack of access to the books and records of the Hospitality Companies, counsel advised him that access could be limited and would be made only upon reasonable notice.[27]

On December 14, 2001, the boards of the Hospitality Companies met. Reuther, Nancy Reuther, and JES were present. JES held a proxy to vote on behalf of Smith. Not much was accomplished. The meeting culminated with JES announcing its termination and walking out. The termination of the meetings was over the objection of the other two directors.[28]

---

[23] WLR Exh. 4.2, 26:11-27:21.

[24] WLR Exh. 4.2, 4:14-7:19; 31:2-21.

[25] WLR Exh. 4.2, 10:7-11:17.

[26] WLR Exh. 4.2, 16:12-17:8.

[27] WLR Exh. 4.2, 17:1-2.

[28] WLR Exh. 4.3. As an aside, after JES left the meeting, Reuther moved and Nancy Reuther seconded a motion for JES' removal as president. The motion carried. Under the Bylaws a quorum was present at the start of the meeting. Pursuant to La.R.S. § 12:81(C)(7), the subsequent loss of directors sufficient to constitute a quorum after the meeting is called, does not deny the board the right to proceed. Reuther and Nancy Reuther have not pressed this point. Because this was a special meeting of the boards of the Hospitality Companies, and the intent to remove and elect a new president was not noticed on the original agenda, this motion was probably not valid. The Court makes note of it because it is yet another instance, in the Court's mind, where the Reuthers refrained from asserting a legally plausible position in favor of a more measured approach legally and administratively.

At the next shareholders meeting of the Hospitality Companies held in June of 2002, financial statements of the Hospitality Companies were presented.[29]  At the meeting, the Hospitality Companies' chief financial officer ("CFO") admitted that the financials of NOP did not include income received from Shreveport Paddlewheels, LLC.[30]  Though Shreveport Paddlewheels, LLC was a wholly owned subsidiary of NOP, both JES and the CFO related that the money was being accounted for "off the books" of NOP.[31]  A separate accounting of those funds was not delivered.[32]  Both Reuther and Nancy Reuther also confronted JES and the CFO over lack of access to the financial statements in advance of the meeting, lack of access to the outside certified public accountants auditing the financials and generally, lack of access to the Hospitality Companies' books and records.  Counsel for the Hospitality Companies was present at this meeting and again opined that the Reuthers' access to this information could be limited and only upon reasonable notice.[33]  The CFO confirmed that he had been instructed by JES, after a specific request from the Reuthers, not to divulge the audited financial information.[34]

After the smoke cleared, the final action of the shareholders was to elect the boards of the Hospitality Companies.  JES nominated a slate consisting of four Smith family

---

[29]   WLR Exh. 4.4, 48.

[30]   WLR Exh. 4.4, 59:8-12.

[31]   WLR Exh. 4.4, 60:24-61:3.

[32]   WLR Exh. 4.4, 123:13-16.  At the time, Shreveport Paddlewheels held a minority interest in a riverboat casino located in Shreveport, La.  Substantial revenues had been earned by this investment, approaching $1.4 million per year. Tr.T. at 248.

[33]   WLR Exh. 4.4, 89:23-91:12.  JES and counsel did not acknowledge that Robert Reuther, as a director, was entitled to full access to all financial information and JES refused to accept even counsel's recitation that shareholders holding 5% of the stock of the companies, on written request would have access to the information.

[34]   WLR Exh. 4.4, 61:4- 64:24.  Requests for the financial information of the companies had been made, in writing, 12 days prior to the meetings, WLR Exh. 4.4,  66:16-67:11, 73:23-74:9, 89:3-17, 121:11-22.

members, JES, Smith, Jason Smith and Duane Smith. The slate was defeated.[35]  Following

the defeat of the Smith slate, Robert Reuther nominated, as a Reuther slate, JES, Smith,

Nancy Reuther and himself to the boards.[36]  Reuther supported this motion and in so doing

removed himself from the boards of the Hospitality Companies, companies he both founded

and in which he held the largest single ownership interest, forty-nine percent (49%).

However, the slate did continue the balance of power on the boards, between the two

families.

The slate passed unanimously, with JES voting in favor both for himself and all other

Smith shareholders.[37]  The meeting was adjourned, and as was the practice, a board of

directors meeting immediately followed.

Reuther's attempt to continue the balance of power was quickly turned against him.

The first order of business taken up by the boards of he Hospitality Companies was the

objection, by JES, to Nancy Reuther's qualifications to serve as board member.[38]  Under the

Bylaws, JES asserted, and his firm confirmed,[39] that board members were required to also be

shareholders of the corporation.  Since Nancy Reuther was not a shareholder, she was not

qualified to hold the position of director.

Under fierce and audible opposition, JES then summarily dismissed Nancy Reuther's

further participation on the board.[40]  The board, comprised of JES, Smith and Robert

---

[35]  WLR Exh. 4.4, 127:4-8.

[36]  WLR Exh. 4.4, 128:5-9.

[37]  WLR Exh. 4.4 129:5-6.

[38]  WLR Exh. 4.5, 3:12-13, 5:3-24.

[39]  WLR Exh. 4.5, 5:22-24.

[40]  JES objected to Nancy Reuther as president of the Hospitality Companies.  After unilaterally declaring
her unqualified, he noted that whether or not she remains a viable director "may or may not be worked out
in court."... "We are going to carry this out and then we'll leave it to the courts to decide if there is an issue."
 WLR Exh. 4.5, 12:18-22, 19:12-15.

Reuther, then elected Craig Smith as secretary, Smith as treasurer, and JES as president. The vote was recorded, JES voting for himself and Smith in favor, Robert Reuther and Nancy Reuther opposed.   By the same vote, the boards also approved JES' own compensation package.[41]

At a meeting of the Hospitality Companies' boards in July of 2002, Robert Reuther again objected to the exclusion of Nancy Reuther as a director.[42] He also objected to his lack of access to financial information and those that prepared and audited the information.  JES' response was to recount that Robert Reuther had no right to demand access to those that prepared the statements or the outside auditors that reviewed them for accuracy.  JES further declared that all requests or questions regarding the financial information had to be presented to him.[43]

Despite a clear voting majority in Smith hands, no other meetings were conducted by the Hospitality Companies' boards following July 2002.[44]  This is curious given the fact that JES maintains that the board is now comprised of only three members, two Smiths and one Reuther.[45]  JES instead maintains that necessary corporate action has been effected through the use of the Hospitality Companies' executive committees.  He further asserts that under the Bylaws, these committees have all the same powers vested in the boards and may exercise that authority in between meetings of the boards.

---

[41] WLR Exh. 4.5, 24:1-26:25.  JES' compensation had been, and continued to be, twenty percent (20%) of net profits.

[42] WLR  Exh. 4.6, 4:1-18.

[43] WLR Exh. 4.6, 8:5-12

[44] Tr.T. at 346.

[45] Tr.T at 204.  Perhaps JES feared that the Reuthers would vote to replace the vacancy created by JES' challenge to Nancy Reuther with another qualified director/ shareholder/ member of the Reuther family.

Following the events of 2001, much litigation between the Smiths and Reuthers has ensued in the state courts without resolution. On July 18, 2006, the Reuthers filed their Motion for Appointment of Trustee. The Motion was followed by the City's Motion for Appointment of a Trustee. The motions allege both malfeasance on behalf of debtor's management and a deadlock of its governing board. A finding of either would support the appointment of the trustee.[46]

## Discussion

*Malfeasance*

It is clear to this Court that JES' actions prior to the filing of this case were duplicitous and self serving. On more than one occasion, JES has taken a liberal view of his power as president at the expense of the directors or Reuther as CEO. It is clear to this Court that JES lacks the appropriate respect for the lines of authority in any corporate structure.

For example, JES locked Reuther out of the corporate offices at a time when he was both CEO and a director, refusing him access to the books and records of the companies, auditors or those preparing the financial information, and prohibiting those with financial information from timely supplying it to Reuther. In so doing, JES breached his duty to the boards of the Hospitality Companies and overreached his authority.[47]

Louisiana law provides that directors have full access to all corporate records and those that prepare them. To hold otherwise would put directors in the untenable position of being legally and personally responsible to shareholders for malfeasance while denying them

---

[46] 11 U.S.C. § 1104; *see also, In re Petralex Stainless, Inc.*, 78 B.R. 738 (Bankr. E.D.Pa. 1987); *In re Advanced Electronics, Inc.*, 99 B.R. 249 (Bankr. M.D.Pa.1989); *In the Matter of Tahkenitch Tree Farm P'ship*, 156 B.R. 525 (Bankr. E.D.La. 1993).

[47] Evidently financial information was being prepared regularly, because JES testified that he received it monthly. Tr. T. 108. Additionally, the results of an outside audit were also delivered to JES in this year, but the Reuthers were denied access to this information in favor of "internal financials."

the tools necessary to determine if malfeasance has occurred.  The directors are not required to accept blindly, the attestations of the president.  Particularly with regard to financial information, they must be allowed to examine the underlying documents which support the financial statements, the personnel that prepare them, and outside professionals that review them for accuracy.  If not, their ability to independently evaluate the performance of the president or the accuracy of the information he presents to them is severely hampered.  If questions of performance or honesty arise, it would be a breach of duty to not inquire further. Directors have an absolute and unqualified right to all corporate books and records.[48] JES' continued refusal to honor requests by directors for financial information or allow them direct access to the employees or professionals that prepared or audited the financial information is indicative of his inability to grasp the hierarchy of authority within a corporation.  That the board has the responsibility to manage the affairs of the company, supervise its officers, and holds a fiduciary responsibility to its shareholders, seems to have escaped JES' understanding.

The lack of respect for this simple principle of corporate governance by JES is evident in his exchanges with the board.  On many occasions he is heard to complain that board meetings are a "waste of time" and "disruptive" to what he is trying to accomplish as president.[49]  While the Court will acknowledge that having to account to a hostile board may be difficult and frustrating, the fact remains that a president must account. There is really no other option provided he wants to remain in the position. The president serves at the pleasure of the board, not the other way around.

---

[48] *Pittman v. Riverside Realty Co*, 36 So.2d 642, 643 (La. 1948)(unless properly enjoined by a court, directors may not be barred access to corporate records); Glenn G. Morris & Wendell H. Holmes, *Louisiana Civil Law Treatise, Business Organizations* § 24.03 (West 1999).
[49]  WLR Exh. 4.3

Equally troubling to the Court is JES' lack of concern for failures of disclosure to the Court. JES did not disclose the ownership interests of a wholly owned subsidiary of NOP, Shreveport Paddlewheels, LLC on debtor's schedules. He claimed at the trial on these motions that the company was defunct because its only asset, a minority interest in Hollywood Casinos, was worthless due to its bankruptcy. However, it remains that Shreveport Paddlewheels, LLC supplied substantial dividends to the debtor before this transpired. The testimony at trial, as well as the evidence in the record, establishes that these funds were diverted from NOP to other members of the Hospitality Companies to defray their expenses.[50] When this occurred and how much was diverted was not disclosed.[51]

The Court is also troubled by JES' pre-petition practice of eliminating any dividend income received from Shreveport Paddlewheels, LLC from the books of NOP. This "off the books" accounting makes the records of the debtor inherently untrustworthy.[52] The Court accepts the testimony of the City's representative that in meetings with the City in 2003, JES omitted the disclosure of significant income in the form of dividends from Shreveport Paddlewheels, LLC when he delivered financial statements of NOP to the City. Mr. Muse, Deputy Director of Finance for the City of New Orleans, testified that when questioned by the City at the meeting, JES insisted that all Shreveport Paddlewheels, LLC dividends

---

[50] Tr.T. at 247, 249.

[51] JES testified at first that Hollywood Casinos filed for chapter 11 relief in 2003 and that dividends were not *received* for about a year preceding their filing.. When the City of New Orleans revealed that Hollywood Casinos did not file for relief until 2004, JES quickly lengthened the period of time that dividends were not paid. Tr.T. at 306. The Court notes that regardless of when the dividends were received, it appears that as much as $1,600,000 in dividends was in the accounts of NOP at Whitney within the last few years and that this money was diverted to sister corporations. Tr.T. at 247-249; Tr.T.2 at 199.

[52] WLR Exh. 4.4, 59:8-12.

13

belonged to the shareholders of NOP directly and not NOP.[53]  At the same time JES was insisting to the shareholders of NOP, that the dividends belonged to NOP and would not be released to them.  JES' simultaneous positions are legally at odds with one another and are yet another example of his propensity to ignore the facts when it suits him to do so.  To omit a material stream of revenue to the city by maintaining it was not the debtor's property, even as he argued to the share holders that it belonged to NOP was, at a minimum, a sharp practice.  The Court believes that, in fact, NOP retained the ownership interest in Shreveport Paddlewheels, LLC and that all dividends collected from Shreveport Paddlewheels, LLC, were NOP's property.

The City has complained that over $1,000,000 in dividend revenue was in the accounts of NOP in 2003 and was diverted shortly after the meeting with the City.  JES admitted at trial that the amounts held at the Whitney National Bank ("Whitney") were undistributed dividends from Shreveport Paddlewheels, LLC and owned by NOP. [54]  This testimony is substantiated by Patrick Gros, NOP's outside certified public accountant who testified that he had been unable to determine the nature of, or proper accounting for, an internal, negative balance, in one of NOP's accounts at Whitney in the amount of $1,600,000.[55]  Neither the existence of the funds nor the corresponding debt due from sister corporations were disclosed on debtor's schedules.  Instead it took these motions to bring them to light.

---

[53] Tr.T. at 42.

[54] Tr.T. at 365.

[55] Tr.T.2 at 199.  This raises the further issue of why JES had not informed Gros of the transfer of such a large sum.

Nor did the debtor disclose the existence of a $435,000 intercompany debt owed by Hospitality Enterprises, Inc. to NOP on its Schedule of Assets and Liabilities.[56]  JES' failure to account for this intercompany debt owed by its sister corporation might have been excused as an oversight, or poor accounting, if in fact, it had not become the subject of the debtor's request for approval of post petition financing.  In response to this motion, the Reuthers objected, alleging that sister corporations to the debtor owed it significant funds. The Reuthers believed that the debtor was in a position to call on these companies to pay their debts, a prospect less expensive than the financing proposal offered.[57]  Craig Smith, secretary of the corporation and its operations manager, offered testimony on the debtor's financial condition, the desirability of the loan, and its terms.  Surprisingly, Mr. Smith was not particularly knowledgeable about the Hospitality Companies,[58] alternative financing, or the availability of payment on intercompany debt. It appeared to the Court that Mr. Smith had not bothered to conduct even a cursory review of the Hospitality Companies' records to determine if such a possibility existed.  He did however testify that to the best of his knowledge none of the companies owed NOP any money and none could be made to loan money to NOP.  Imagine the Court's shock when at the hearing on the motions for appointment of a trustee, NOP's outside accountant testified that a $435,000 intercompany debt existed and was on the books of NOP pre-petition.   This debt alone exceeds the total line of credit offered by Whitney.  Equally troubling was the accountant's response that he

---

[56]  Debtor's outside accountant, hired after the filing, testified that Hospitality Enterprises, Inc owed debtor in excess of $435,000 and that this debt was clearly reflected on NOP's books when he arrived.  Tr.T.2. at 190. This amount appears to be independent of the sums taken from the Whitney account.

[57]  Not only would such a prospect have been cheaper, but the concessions required by Whitney regarding super priority status, relief from the stay and approval of the nature and amounts available to pay expenses would have been eliminated.

[58]  Despite being the alleged secretary of each and every one.

had only been asked to look at intercompany debt accounts two weeks prior to the hearings on these motions.[59]

While JES maintains that the books of the company were "a mess," the fact remains that as president, his duties included maintaining the books of the company.[60]  While the Court is no stranger to incomplete and inaccurate records, something more appears to be afoot. The failure of JES to properly maintain books and records is of serious concern particularly when coupled with substantial "off the books" income and a history, both pre and post petition, of failing to disclose assets.

The debtor argues that it has employed a new, independent certified public accountant experienced with chapter 11 reorganizations and it is correcting these problems. But it is clear that to date, the accountant has not been asked, or authorized, to undertake a review and verification of the debtor's pre-petition financial records.  JES testified alternatively, that they did not have sufficient personnel to perform this work, he considered this work a distraction, and he was opposed to the employment of additional professionals because they would be "too expensive."[61]

It is true that JES has taken significant steps to reduce or eliminate costs and stabilize the company.  Many of those steps involve assistance by sister corporations.  As an initial matter, the Court notes that this assistance is in the form of rent relief and personnel sharing. During the trial, JES opined that were he to be removed and a trustee installed, that assistance might well cease.  This assertion is problematic for the Court.  To date, the Court has assumed that the relief offered by the other Hospitality Companies was being done so not out of a sense of generosity or charity, but for sound economic reasons.  The Hospitality

---

[59] Tr.T.2 at 185. This despite the US Trustee's request for an accounting of intercompany transfers at debtors' § 341(a) meeting in June of 2006 (Tr.T. at 105) and debtor's representation to the Court on August 21, 2006 that an analysis was being performed.

[60] Tr.T. at 107.

[61] Tr.T. at 253, 283, 374-375.

Companies have shared debt with the debtor.  The principals of each are identical and the largest shareholders are guarantors on the Hospitalities Companies' bank debt.  The bank debts are also cross collateralized, in some cases.   As a result, the failure of NOP would have a ripple effect on all the Hospitality Companies and the shareholders.  It is for this reason the Court assumed the economic assistance was offered by the Hospitality Companies.  Rather than submit to a veiled threat by JES, the Court assumes that the Hospitality Companies will continue to see the wisdom, and mutual economic benefit, of close cooperation with the debtor.

In any event, without accurate and fundamentally trustworthy records, any records produced are subject to question.  Further, it appears almost certain that the debtor holds substantial claims against sister companies for diverted funds.  Despite debtor's dire need for cash to operate, JES appears unmotivated to determine what is owed or if and when it can be repaid.  The Court believes that JES is dragging out the day of reckoning in the hope that the sums due will never be fully determined or paid.  This coupled with his failure to disclose even their existence constitutes a significant breach of his duties to the Court and creditors.

*Corporate Deadlock*

Upon the filing of the petition for relief by NOP, questions immediately arose as to the propriety of the petition's filing.  Specifically, Reuther challenged the subject matter jurisdiction of this Court by alleging that the petition was filed without proper corporate authority.  This challenge was resolved when Reuther and Nancy Reuther elected to ratify the filing.  Their ratification was with full reservation to challenge the authority of all further corporate action.  The condition on the Reuthers' consent to the filing was accepted by this Court.

17

Debtor subsequently filed a motion for approval of post petition financing.  In response, the Reuthers again challenged the authority of debtor to negotiate, and present to the court, the financing package proposed with Whitney.  At the hearing on the matter, the Reuthers consented to ratify debtor's authority to present the motion and financial package for court approval, with full reservation to challenge each and every aspect of its terms.

While this Court has been able to navigate significant problems concerning corporate control over the debtor and subject matter jurisdiction to date, it has only been able to do so by forging consents between the Smith and Reuther interests.  The fundamental problem of control remains and rears its ugly head at each twist and turn of these proceedings.  It is not only a distraction and unnecessary expense for the estate to bear, but also threatens the successful conclusion of the case.  The resolution of the issue has been brought before the Court in the form of motions for the appointment of a trustee.

Grounds for the appointment of a trustee may exist if a corporate deadlock of the debtor's governing body prevents debtor from receiving the necessary corporate approval to present a plan of reorganization to the court.[62]  However, in order to address whether or not a deadlock exists, this Court must first determine 1)  who holds the offices of management; 2) who is properly on its board; 3) the relative authority of each; and ultimately, 4)  if the party with the responsibility for approving the plan can exercise its duty without a deadlock.

The Court begins by reviewing the corporate history and documents of the debtor. The Articles of Incorporation of NOP ("Articles") provide for a board of no less than four, or more than six, directors.[63]  The board is vested with all authority, and the power to exercise,

---

[62]  *In re Petralex Stainless, Inc.*, 78 B.R. 738 (Bankr. E.D.Pa. 1987); *In re Advanced Electronics, Inc.*, 99 B.R. 249 (Bankr. M.D.Pa.1989); *In the Matter of Tahkenitch Tree Farm P'ship*, 156 B.R. 525 (Bankr. E.D.La. 1993).
[63]  WLR Exh. 1, Art V

all lawful acts allowed under Louisiana law.[64]  Directors are to be elected annually at the

meeting of shareholders, but retain their positions until new directors are seated.[65]

The Articles also provide that the qualifications of directors may be fixed, changed,

increased or reduced by the Bylaws of the corporation, a document wholly within the control

of the board of directors.  The Articles authorize directors to vote by proxy.[66]

Under the Bylaws, the officers of the corporation are designated as president, vice

president, secretary, and treasurer.  Only the president must be a director.  The Bylaws define

the duties of each office.[67]

The Bylaws also provide that the board may appoint such other officers and agents as

it deems necessary.  Officers hold their offices for terms, exercise powers, and perform

duties, as determined from time to time by the board.[68]

All officers hold their offices until their successors are chosen.  They may only be

removed by an affirmative vote of the whole board.  The president is specifically prohibited

from firing officers.[69]

As is consistent with Louisiana law, the board is charged with the management of the

corporation.  Pursuant to the Bylaws, regular meetings of the board may be held at such time

and place as the directors determine.[70]  However, there is an indication that monthly

meetings are contemplated by the Bylaws.[71]  At a minimum, Louisiana law requires that the

---

[64]   WLR Exh. 1, Art. V, A & C
[65]   WLR Exh. 1, Art. V, D & E
[66]   WLR Exh. 1, Art. V, F
[67]   WLR Exh. 2, Art. I, sect. 1
[68]   WLR  Exh. 2, Art. I, sect. 3
[69]   WLR Exh. 2, Art. I, sect. 1,4
[70]   WLR Exh. 2, Art. II, sect. 4
[71]   WLR Exh. 2, Art. I, sect. 1

board meet at least once a year, though no penalty exists should this requirement be ignored.[72]

The Bylaws also require that every director be a shareholder.[73] They also acknowledge that the provisions of the Bylaws may be altered, amended or repealed by the affirmative vote of the shareholders.[74]

JES testified that he utilized a formulary in drafting the Articles and Bylaws.[75] In fact the provisions of both do track the generic language of Title 12 of the Louisiana Business Corporation Code.

It is clear from the record that as of January, 1999, the boards of the Hospitality Companies included Nancy Reuther. In fact, it was JES who first nominated Nancy Reuther for the boards, testifying that he thought it was a "good idea at the time."[76] Nancy Reuther's election to the boards, by the shareholders, was unanimous. Over the ensuing years, she was re-elected, again by unanimous vote, and fully participated in all meetings and decisions without objection. In each and every case, counsel for the Hospitality Companies was present, both at shareholder and director meetings, and voiced no opposition or warning as to her inability to serve, at least until June of 2002.

At the meeting of the shareholders of the Hospitality Companies conducted in June of 2002, Nancy Reuther was again elected, by unanimous vote to the board.[77] Those voting included JES, and through a proxy given to him from Smith, Smith.[78] The shareholders'

---

[72]  La. R.S. § 12:81.

[73]  WLR Exh. 2, Art. II, sect. 1

[74]  WLR Exh. 2, Art. X

[75]  Tr.T. at 76.

[76]  Tr.T. at 148.

[77]  As previously found, also elected were Robert Reuther, Smith, and JES.

[78]   The constituted the full 50% ownership interests of the companies and held by the Smith family.

meetings were adjourned and board meetings of the Hospitality Companies were immediately convened.  Minutes later, despite voting for her election to the boards, JES challenged the validity of Nancy Reuther's qualifications to serve.

Corporate counsel, while present at the shareholders' meetings, sat silent while the Reuther slate was proposed and elected, only voicing her concerns over the propriety of Nancy Reuther's election after the meeting of shareholders was terminated.[79]  The bad faith of JES and his firm is palpable, particularly in light of his single minded goal to completely control these entities.

It is clear to this Court that JES had been searching for a viable means to marginalize the Reuther interests for some time.  In early 2001 he had asked corporate counsel to define his powers over those of other officers.  By October of 2001, he had unilaterally fired Reuther as CEO and locked him out of the corporate offices.  Not satisfied with his removal as CEO, JES legally enjoined board of directors meetings for the Hospitality Companies in December of 2001 in an effort to achieve, through their executive committees, what the boards would never have approved.

When the boards did in fact meet some two weeks later, JES stormed from the meeting because he considered it to be a "waste of time."  He withheld advance access to financial information, and refused to allow the outside accountants to talk to the Reuthers. At the June 2002 shareholders meetings, he proposed a slate of directors consisting of only Smiths, with no pretext of cooperation evident.

With this backdrop, the Court concludes that the challenge to Nancy Reuther as a unqualified director was yet another of JES' sharp practices and illegal.  As a result, the Court finds that by affirmatively voting for Nancy Reuther without objection, JES and Smith

---

[79]  WLR. Exh. 4.5, 15:14-15.                    21

waived their right to challenge her qualifications as a director later.  Additionally, the Court also finds that by unanimously electing Nancy Reuther as director, the shareholders modified, or waived, the provisions of the Bylaws regarding the qualifications necessary to serve as a director.  Principles of estoppel are also evident in this situation.  Finally, the Court also holds that JES lacked the proper authority to vote Smith's interest as a director and therefore the motion to remove her from the boards did not carry.

*Waiver*

Corporate jurisprudence provides that the validity of the election of directors cannot be questioned by a director who has participated in the selection of the board without objection.[80]  In order to preserve the right to challenge, the shareholder must lodge a protest at the time of the election; otherwise, he will have waived his right to maintain a subsequent challenge.[81]

JES' affirmatively voted in favor of Nancy Reuther for director on behalf of himself and the Smith family interests.  By participating in a unanimous decision to re-elect Nancy Reuther to the board without objection, he may not now complain of her lack of qualification to serve.[82]

---

[80]  2*Fletcher Cyc.Corp.* § 293 (Perm. Ed.); *Andrews v Drake*, 83 F2d 767 (6th Cir. 1936); *Buchhalter v Myers*, 276 P.972 (Colo. 1929); *Davey v Masser*, 106 A.2d 92 (Md. 1954).

[81]  *See also, Handley v Stutz, 139 U.S. 417, 11 S. Ct. 530, 35 L. Ed. 227 (1891), and, Hackett v. Diversified Chemicals, Inc.*, 180 So.2d 831 (La. App. 3rd Cir. 1965)(shareholders might have lost right to objection to the election of directors under illegal voting procedures but for timely objection at the time of the vote.)

[82]  It was well known to all present that Nancy Reuther was not a shareholder.  WLR Exh. 4.4, 5:24-6:21. The entire list of shareholders was made of record at the meeting.  As for the qualifications of directors to serve, JES as the drafter of the Articles and Bylaws, and corporate counsel to the corporation, is deemed to know, better anyone, of their requirements.   By voting for this candidate without reservation, he therefore waived of his right to later object.

*Shareholder Action Overrides the Bylaws*

It is clear that the election of directors is the sole right of the shareholders.[83]  The shareholders may delegate the right to set the qualifications of directors to the board, and in this case, the Articles do provide that the board may determine the qualifications of directors.[84] The Bylaws of the corporation provide that all directors must be shareholders.[85] However, they also provide that the provisions of the Bylaws may be repealed, amended and modified by the shareholders.[86]

It is the shareholders, not the directors, who elect the board.  It is their one and most important right, to select those persons who they deem most capable of managing the corporation.  The shareholders clearly knew Nancy Reuther was not a shareholder.  Since Nancy Reuther was elected by unanimous consent, they presumably believed her to be a person capable of representing their interests and those of the Hospitality Companies.  It may also be presumed that by unanimous vote, they elected Nancy Reuther to serve as a director *in spite of* a Bylaw directive to the contrary.  If the contrary were true, objection to her election would have been lodged.  Since the shareholders clearly have the right to repeal or abolish the bylaws in their entirety, they also have the right to take the lesser action of waiving or overriding their application in a specific case.

In *Board of Commissioners for Vermillion Hospital Service District*, 378 So.2d 919 (La. 1980), the Louisiana Supreme Court confirmed that the right to modify or amend the bylaws encompasses the right to waive or disregard their application.  If those with the power to amend the bylaws, by the same vote necessary to amend, adopt an action

---

[83]  La. R.S. 12:73.

[84]  La.R.S. 12:81 C; WLR Exh. 1, Art. V, F

[85]  WLR Exh. 2, Art. II, sect. 1

[86]  WLR Exh. 2, Art. X                    23

inconsistent with the bylaws, their action will be deemed an amendment or waiver of the bylaws.

Thus, this Court holds that the unanimous vote of the shareholders in the selection of Nancy Reuther with full knowledge of the fact that she was not a shareholder, constitutes a waiver of the Bylaws' requirement that she be a shareholder of the Hospitality Companies for which she serves.

*Estoppel*

The Court believes that application of the equitable principle of estoppel is warranted under these facts. Louisiana Civil Code Art. 1967 provides that detrimental reliance may be grounds to estopp certain action when the conduct of a party justifiably induces another to changes his position to his detriment.

The Court finds that the elements of estoppel exist in this case. First, JES as the drafter of the Articles, Bylaws, former corporate counsel and member of the firm representing NOP, had a duty to disclose to the shareholders, at the time of nomination, any defects in the qualifications of nominees. JES as the drafter of the Articles and Bylaws is presumed to know their content. He was also well aware that Nancy Reuther was not a shareholder of most, if not all, the Hospitality Companies.

JES and his firm were co-conspirators in this deception. Staci Rosenberg did not advise the shareholders at the time the slate was proposed, that one of those nominated was not qualified to serve. From at least 2001, Ms. Rosenberg had regularly attended the meetings of the shareholders and directors of the Hospitality Companies. She frequently

offered her legal opinions to various actions, even when not solicited to do so.[87]   The

Reuthers had every right to expect that she would advise them if any action they were

proposing was not authorized by corporate law or the controlling documents.  Instead she sat

silent, this Court can only surmise, in an attempt to gain an unfair advantage in favor of the

Smiths.

The Court notes for the record that the Reuthers attempted to remove the JES law

firm as corporate counsel at the directors meetings held on November 21, 2001 because they

did not believe the firm was unconflicted.  The motion was predictably defeated by the Smith

directors.[88]   At a later meeting of the executive committees on December 4, 2001, Ms.

Rosenberg assures the Reuthers that she represents all the Hospitality Companies and can be

"absolutely" impartial to both sides' interests.[89]

Staci Rosenberg not only failed to timely notify the shareholders of the problem with

Nancy Reuther's qualifications to serve, she also failed to advise the Reuther interests of

their right to correct the problem.  Under the amendments to the Bylaws passed in December

of 2001 by the Executive Committee, the Reuthers alone controlled the right to fill the

vacancy created by the challenge to Nancy Reuther's election.  Ms Rosenberg was present at

that Executive Committee meeting yet she did not advise the three Reuther shareholders, all

of whom were present, of their right to replace Nancy Reuther.[90]   If she had, the three

---

[87]   For example, at the meetings of the executive committees held on December 4, 2001, Ms Rosenberg stops
JES from offering resolutions in toto for all the Hospitality Companies, instead instructing him on how to
present them for approval.  WLR Exh 4.2, 3:4-10.  At the directors meetings held on December 14, 2001, she
instructs Reuther not to offer or vote on a resolution to fire JES as president after he leaves the meetings.  WLR
Exh 4.3, 32-38.  Neither of these opinions was directly solicited.  The Court notes that both were offered
spontaneously to protect the position of JES.  As corporate counsel, Ms. Rosenberg owed Reuther the same
duty.
[88]   WLR Exh. 4.1, 12-14:17.
[89]   WLR Exh. 4.2, 4:24-5:8.
[90]   WLR Exh. 4.5, 1-4.

shareholders could have immediately elected another Reuther family member as a substitute for Nancy Reuther. The Reuthers had every reason to believe that Ms. Rosenberg would advise them of this right and she did not. As a result, Nancy Reuther was removed from the boards, and as secretary of the Hospitality Companies.

Given his position as a long standing director, president, the drafter of the critical corporate documents, and member of the law firm representing the companies, by the simple act of voting for Nancy Reuther as a board member, JES represented to those assembled that he believed Nancy Reuther to be qualified and competent to serve. It was, after all, JES who nominated her to the boards in the first instance. The absence of objection, from either JES or his firm, coupled with Nancy Reuther's long standing membership on the board and participation, without previous question or objection, would justifiably induce the Reuther interests to believe that she was qualified to serve. The Reuthers had a right to rely on that assumption given JES and his law firm's duty to disclose any potential defects with the slate.

Reuther's position was modified, to his detriment, as a result of this reliance. As a member of the board himself, Reuther relinquished his position believing that his interests as the largest stockholder in the Hospitality Companies were adequately represented. He did not have to nominate a balanced slate. Following JES' bid for an all Smith board, his proposal was both magnanimous and unrequired. Had JES' objection to Nancy Reuther's qualifications been made at the time of the shareholders meeting, a different slate could have been proposed. One of two results would have occurred. The slate would have been defeated and the sitting board would have remained, or a new but balanced board would have been elected. Either way, Reuther's interests would have been protected.

26

*JES Lacked Proper Authority to Vote Smith's Interest as a Director*

It was JES who moved, and seconded his own motion, for Nancy Reuther's removal from the board.   By a vote of two to one, JES and Smith in favor and Robert Reuther opposed, the motion was recorded as carried.   However, because JES failed to prove at the trial of this matter his ability to vote the interests of Smith as a director, this Court holds that the motion was not properly seconded and did not carry.

At the trial on the merits, a proxy was admitted into evidence to support JES' authority to vote the elder Smith's interests.   Those interests, when coupled with his own, constituted fifty percent (50%) of the voting shares of NOP and two votes on the newly elected board.   However, the proxy offered only allowed JES to vote the interests of Smith as a *shareholder*, not as a director.   This issue was specifically raised on the cross examination of JES by Reuther's counsel.   No offer of authority was supplied other than JES' assertion that 'he had a proxy.'[91]

The Court finds JES' offer of proof insufficient.   Therefore, JES lacked the requisite authority to vote on behalf of Smith as a director and as such, his motion to remove Nancy Reuther was improperly seconded and carried.

For all these reasons, the Court finds that Nancy Reuther was properly elected to the board of directors of NOP in June of 2002 and is entitled to serve as a director.   Having determined that the boards of the Hospitality Companies are composed of the following

---

[91]   Though JES testified that he had a second proxy authorizing him to vote the interests of his father as a director, it was not offered into evidence. Tr.T. 202 - 203.  The Court does not find JES' testimony regarding the existence of a second proxy credible.  With so significant an issue riding on his right to proceed, the Court believes that had a second proxy existed, it would have been produced.  In any event, whether existing or not, for the multiple reasons set forth above, the Court holds the actions of the board to remove Nancy Reuther were illegally taken.

members, Nancy Reuther, Robert Reuther, Smith and JES, the Court now turns its attention

to the positions of chief executive officer and president.[92]

*Officers of the Hospitality Companies*

*Reuther as CEO*

In October of 2001, JES unilaterally fired Reuther from his office of CEO, insisting

that the office was unauthorized by the Bylaws or boards of the Hospitality Companies.  At

trial he maintained that as president, he was firmly convinced that he had the power to fire

Reuther.[93]  His position stems from the belief that because the Bylaws do not specifically

create the position of CEO, Reuther's election was illegal.  Further, because the boards never

defined the duties of the CEO, his title was "ceremonial" at best.[94]

The Bylaws clearly provide that the board is free to elect such other officers or agents

as it deems necessary.  By corporate resolution dated January 11, 1995, the board did just

that, electing Reuther CEO.  Reuther testified that he was given the title of CEO when he

suggested to Smith his need for additional help in running the companies.  At that time,

Joseph Fredrick, Jr., a former general manager for Hilton Hotels, was retained and elected by

the board as president.[95]  In 1998, when JES approached Reuther about the presidency, JES

transmitted his understanding of what Reuther and JES' respective roles in the Hospitality

Companies would be.[96]  The division of responsibility had JES acting as the chief operating

officer in charge of the general, administrative and financial aspects of the companies.

---

[92]  For these same reasons, the Court finds that Nancy Reuther was not removed as secretary, nor was Craig Smith elected secretary in her stead.

[93]  Tr.T. at 284, 319.

[94]  Tr.T. at 127.  JES also maintained that the title of CFO was also ceremonial, but by resolution of the boards in January of 1999, JES himself proposed the new position of CFO which was adopted by the boards.  WLR. Exh. 3.9.

[95]  WLR Exh. 3.2; Tr.T.2 at 65-66.

[96]  WLR Exh. 6.5.

28

Reuther, as CEO, was to handle marketing and assist in the formulation of the budget.   The minutes of the meeting electing JES as president reflect this understanding with Reuther being the corporate "visionary"/ developer and JES, as president, in charge of day to day operations.[97]

The distinction between agent, employee, or officer of a corporation is not determined by the nature of the work performed but the relationship of the individual to the corporation.   "Executive officers" are those appointed by the board and who report to the board directly, as opposed to other officers.   They hold managerial responsibilities for the affairs of the corporation that import a close connection with the board.[98]  When in the usual course of the business of a corporation, an officer has been allowed to manage its affairs without limitation by the board, his authority may be implied.[99]   The record is clear and apparent that Reuther was an active, responsible, and energetic officer.  He was held out to the community at large as the Hospitality Companies' CEO without objection or correction by the boards.   A simple review of a portion of the exhibits submitted into evidence establishes this fact.

Elected by the boards of the Hospitality Companies as CEO in November of 1995, no board action was ever taken to remove Reuther from this position.    In fact, there is no indication that his removal was ever under consideration.   Instead, the minutes of the

---

[97] WLR Exh. 3.9. The net effect of this action and the conduct of the boards historically was to divide the responsibilities originally housed in one office, that of president, into two offices.  This is consistent with Reuther's testimony that in 1995 he went to Smith for help because the duties of president for all the companies had become overwhelming.  In response the position of CEO was created and the duties of day to day management given to the president.  The CEO was to handle marketing and development.

[98] *Guillory v. Atena*, 415 F.2d 650 (5th Cir. 1969); *Bruce v. Travelers Ins. Co.*, 266 F.2d 781 (5th Cir. 1959)

[99] *Esso Standard Oil Co. v. Welsh*, 105 So.2d 233 (La. 1958); *Slagle v. Peyton*, 162 So. 12 (La. 1935); *J. Perez, S.A. v. Louisiana Rice Growers, Inc.*, 139 So.2d 247 (La. App. 3rd Cir. 1962).

meetings of the boards, as well as the corporate records of the companies, are full of references, reports, assignments and actions all undertaken by Reuther, as CEO, at the boards' request.[100]  Far from distancing themselves from Reuther's position and authority, the boards of the Hospitality Companies acknowledge his position to market the company, develop special projects, or handle the negotiation of significant business matters.  It is indisputable that Reuther reported directly to the boards and not through JES.  It is also indisputable that he had specific areas of influence and power, separate and apart from JES.  Reuther was the developer, 'big picture' officer of these companies.  Time and time again he is seen to be negotiating new ventures, acquisitions, renovations or the construction of new projects, marketing the businesses of the Hospitality Companies and handling negotiations with City or other governmental agencies involved in the operations of the Hospitality Companies.  These are exactly the type of duties one would expect from a CEO and there seems to be no question that Reuther occupied that position.

   Also apparent is JES' acknowledgment of Reuther's duties and position.  At no place in any of these documents does JES voice, to the boards of any of the Hospitality Companies, any opposition to Reuther's activities or actions.  JES himself appears to accept Reuther as CEO even as he refuses to recognize him formally by that title.

---

[100] In WLR Exh. 3.9, he reports to the boards on the profitability of the Tulane Liberty Bowl and negotiations with a Washington and New York marketing firms.  In WLR Exh. 3.9, Reuther announces to the boards a new busing contract, negotiated by him with USL for New Orleans Tours, Inc.  At that same meeting the boards charge him with developing a plan for the running of the new Royal St. Charles Hotel before it opens.  In WLR Exh. 3.15, the board of Lodging, Inc. confirms that he will "allocate the management" for the company, and he reports on the development of Bayou Savage Swamp Tours, Ltd.  WLR Exh. 3.17 reveals that he was the direct supervisor of renovations for the newly acquired Ramada Garden District Hotel, and he reports on the status of negotiations with the New Orleans Aviation Board for Airport Shuttle, Inc.  He also informs the boards as to the status of zoning issues coming before the City Council in connection with the Astor Hotel project.  The boards also authorized him to negotiate a contract on behalf of the companies with Sleep Hotels.  Finally, Reuther is given authority to ratify a borrowing made by JES for the Zyphers without corporate authorization.  These documents span a period of time beginning from 1997 through August of 2000 and are just a sample of Reuther's involvement in the

There are also other indications, more specific, of Reuther's position.  Corporate minutes and certificates of incumbency, created throughout this period, acknowledge and confirm Reuther as CEO.[101]  JES acknowledged that Reuther had business cards and stationary with the designation of CEO of the Hospitality Companies.[102]  JES also admitted that Reuther was roundly heralded by both employees within the organizations, as well as the public, as CEO of the Hospitality Companies.[103]  In a Gaming Control Board Application filed by NOP, Reuther is listed as CEO.[104]  Even JES' law firm addresses him in correspondence as CEO and corporate contracts were edited by counsel specifically for the purpose of correcting his title as such.[105]  Finally, it goes without saying that Reuther had a substantial financial interest in the Hospitality Companies.  This interest was move than an investment as Reuther also executed guarantees for bank debt owed by the Hospitality Companies as late as August of 2001.[106]

The Bylaws specifically provide that the board may, at its discretion, appoint such other officers as it shall deem necessary.[107]  Once elected, the officer serves at the boards' pleasure until removed by an affirmative vote of a majority of the board.  JES as president is specifically prohibited from firing any officer elected by the boards.[108]

While JES claims that Reuther's position as CEO was "merely ceremonial," his protestations are disingenuous.  If in fact Reuther was CEO only in name, JES, as a

---

Hospitality Companies as CEO.

[101]   WLR Exh. 3.2, 3.14, 3.15, and 3.17 for example.
[102]   An example can be found at WLR Exh. 6.17; Tr.T. at 116-117.
[103]   Tr.T. at 117.
[104]   WLR Exh. 8.3, 6.18.
[105]   WLR Exh. 6.13, 6.14, 6.15.
[106]   WLR  Exh. 8.18.
[107]   WLR Exh. 2, Art. I, sect. 3
[108]   WLR Exh. 2, Art. I, sect. 1, 4

31

"specialist" in corporate law, would certainly have taken action to prevent those dealing with the Hospitality Companies from being misled.[109]  At a minimum, by allowing one cloaked with only apparent authority to hold himself out as CEO to the public, JES was in effect ratifying his actions as such.

The Court instead believes, and it is supported fully by the corporate records of these companies, that Reuther was the duly elected CEO of the Hospitality Companies and remains in that position to this day.  The Court finds that JES' actions in removing Reuther from this position to be without legal merit or effect.  Only by affirmative majority vote of the whole board could Reuther be terminated as CEO.

*JES as President*

While Reuther is the CEO of the Hospitality Companies, JES is clearly its president. Elected in January of 1999,[110]  JES has consistently been referred to in minutes of shareholder and director meetings, corporate records, and other documents as the president.[111]  Although Reuther argues that JES' term was to be only for one year, the subsequent re-election of him as president by the boards, without term limitation, makes this point moot.[112]

*The Relative Powers and Duties of the CEO, President, Board of Directors and Executive Committee*

Having determined who sits on debtor's board and holds its managerial offices, the Court must now consider whether or not the debtor, as a debtor in possession, can formulate

---

[109]  Tr.T. at 117.
[110]  WLR Exh. 3.9.
[111]  The Court finds the testimony of Claire Durio on this point credible.  However, for the reasons stated, it is without effect.
[112]  WLR Exh. 3.12

and legally propose, a plan of reorganization to move this entity forward and out of bankruptcy. The first inquiry involves who formulates a plan and then who approves a proposed plan for submission to creditors and court. Only by reaching this conclusion can the Court determine if the debtor has the ability, in a practical sense, to obtain the necessary corporate approvals to submit a plan for consideration. If it can not, the appointment of a trustee would be in order.

The activities and powers of the board, and a corporation's officers, may be gleaned by custom and history.[113] The duties of board and officers are broadly defined under Louisiana law. The board is the primary agent for the management of the corporation. Elected by the shareholders, it has a general duty of supervision but not daily involvement. It wields power on behalf of the owners and controls the corporation's agents, its officers. With all corporate power vested in the board, the officers have authority to act only to the extent their power is conferred by charter, bylaw or resolution.[114]

The office of president, itself, confers no power to bind the corporation or control its property in and of itself.[115]

But who controls the right to formulate and present a plan of reorganization? Without specific reference, the Court must glean the answer based on the corporate documents themselves, Louisiana law, and the conduct of the company historically.

---

[113] *Esso Standard Oil Co. v Welsh*, 105 So.2d 233 (La. 1958); *Slagle v Peyton*, 162 So. 12 (La. 1935); *Wolff v Caddo-Bossier Safety Council, Inc.*, 168 So.2d 913 (La. App. 2d Cir. 1964); *J. Perez, S.A. v. Louisiana Rice Growers, Inc.*, 139 So.2d 247 (La.App. 3d Cir. 1962).

[114] Glenn G. Morris & Wendell H. Holmes, *Louisiana Civil Law Treatise, Business Organizations* § 14.03 (West 1999).

[115] *Fluidair Products Inc., v Robeline Marthaville Water System*, 465 So.2d 969 (La. App. 3rd Cir. 1985).

*Powers of the Officers*

The Articles are silent as to the duties of corporate officers. The Bylaws state that the president shall have general and active management of the business of the corporation. The president shall see that all orders and resolutions of the board are carried into effect. The president shall have the duties of supervision and management, including the sole authority to hire and fire employees, and generally all matters having to do with the normal day to day operations of the business.

The Bylaws make clear that the powers of the president are merely managerial and over day to day operations. They are not broadened by any grants of authority beyond those typically held. For example, the president is not granted the general right to borrow, negotiate a restructure of company debt, or sell substantial assets. Reviewing the resolutions, minutes of meetings, and other corporate records submitted into evidence, it is clear that the boards, and sometimes the shareholders, reserved for themselves, the authority to specifically authorize actions, on a case by case basis, outside the ordinary course of business.

The duties of CEO are more problematic. They are neither spelled out in the Bylaws nor in specific resolution or minutes. Given the history of the companies and the boards' conduct with respect to Reuther, it appears, consistent with the plan proposed by JES in 1999 that Reuther was to provide the long term vision, or business plan, for the companies, develop new ventures, as well as market company services and deal with governmental interests. Though responsibility for the long term vision of the company is closer to the authority to formulate a plan of reorganization, without a specific resolution to reorganize

34

debt, incur new borrowings, or sell substantial assets, this Court can not find that a general grant to direct the company's progress includes the right to present a plan of reorganization.

Specifically, the board reserved for itself, and routinely exercised, its right to approve all new financings, substantial sales of property, and restructures of ownership. Given this history, it is unclear how one could conclude that a plan of reorganization, which often will include elements of each of these acts, could be vested in an officer. Thus the Court concludes that the officers are not unilaterally authorized to formulate and propose a plan without board approval.

Debtor cites the Court to *In re Jim Beck, Inc.*, 214 B.R. 305 (W.D. Va. 1997) as authority for the principle that the president is authorized to present this debtor's plan. The applicability of *Beck* turns on the power of NOP's executive committee to authorize the president to so act.

*Powers of the Executive Committee*

JES argues that under the Bylaws, the executive committee, composed of the president, secretary, and treasurer, is vested with all the power held by the board and may act on its behalf in between board meetings. This Court does not find that the general grant of authority in the Bylaws authorizes the executive committee to function as the equivalent of the board for purposes of formulating and proposing a plan or taking any action outside the ordinary course of business.

Under Louisiana law, a board may form committees, composed of directors, for the purpose of conducting board business.[116]  As an initial matter, the Court notes that the executive committee is not composed *of directors, but officers* of the corporation. Given that

---

[116] La.R.S. § 12:81(C)(8).

the Bylaws define the duties of officers as clearly managerial in nature, and there are no requirements in the Bylaws that officers also be directors, this Court holds that the creation of an "executive committee" under the Bylaws by the board did not create a committee *of directors*, as required by state law.[117]

Second, while Louisiana law does not limit the scope of authority that a board may delegate to agents, noted commentators have observed that to completely abdicate all governing authority *even to a committee comprised out of a subset of the board,* might well constitute a breach of fiduciary duty in and of itself.[118]  Thus, for this Court to accept JES' view of the executive committee's authority, it would have to find that in passing the Bylaws, the board intended to abdicate total control of this corporation to its officers for an indeterminate amount of time.  To come to such a conclusion would require this Court to import a level of deference to the officer class by the boards of the Hospitality Companies that simply does not exist.

In fact, absolutely no executive committee meetings were ever held by any of the Hospitality Companies prior to December 4, 2001 when JES began utilizing this vehicle to avoid a meeting of the full boards.[119]  It appears even then, that this is the only recorded meeting.

The Hospitality Companies have enjoyed very active boards.  These boards, until the recent past, met frequently, even monthly,[120] and historically exercised significant

---

[117]  As a further indication of this fact, the executive committee is authorized to manage the affairs of the corporation *between board of directors meetings.*  Since the Bylaws contemplate that these meetings will be held monthly, the board could not have envisioned that much in the way of significant action would be necessary.  WLR Exh 2, Art. I, sect. 1, 4

[118]  Glenn G. Morris & Wendell H. Holmes, *Louisiana Civil Law Treatise, Business Organizations* § 19.06 (West 1999).

[119]  Tr.T.2 at 128.

[120]  Tr.T. at 113.

supervision over the officers of the Hospitality Companies.  Nothing in the record of the

case, or the conduct of the Hospitality Companies, indicates that these boards did not take

their role in corporate governance seriously.  Nothing substantiates the view that they would

so completely abdicate their responsibilities to the officer class.  Therefore the Court holds

that the executive committee lacks the authority to formulate or approve a plan.  It is

therefore also lacks the authority to delegate to the president what it could not do itself.

*Powers of the Board*

The general rules of corporate governance remain the purview of state law in a

bankruptcy proceeding.[121]  Absent a specific grant of authority, the board of directors

remains the authority to propose a plan of reorganization to creditors and court alike for

approval.[122]

## Conclusion

Section 1104(a)(1) provides that a trustee may be appointed "for cause, including

fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by

current management either before or after the commencement of the case…." and (2) under

section 1104(a)(2), "if such appointment is in the interests of creditors, any equity security

holders, and other interests of the estate."

The appointment of a trustee is an extraordinary remedy as there is a presumption

that the debtor shall remain in control and possession of its business.  After review of the

---

[121]  *In re Johns-Manville Corp.*, 801 F.2d 60, 64 (2d Cir. 1986).

[122]  *In re Dark Horse Tavern*, 189 B.R. 576 (Bankr. N.D.N.Y.1995); *In re I.D. Craig Service Corp.*, 118 B.R. 335, 338 (Bankr. W.D.Pa. 1990) (corporate president generally cannot bind the corporation in a bankruptcy proceeding absent authority of the board of directors); *In re Jim Beck, Inc.*, 214 B.R. 305 (W.D. Va. 1997)(President given specific authority by board to institute bankruptcy and carry out all requirements of case as

evidence and testimony, the Court is convinced that the appointment of a trustee is warranted and necessary.

The evidence clearly establishes that both pre and post petition, debtor's management failed to property account for or disclose the existence of significant intercompany obligations and other assets. Though the debtor argues that the failures were inadvertent or immaterial, the Court believes otherwise. The disclosure of debtor's interest in Shreveport Paddlewheels, LLC has led to the discovery of diverted income from the debtor in favor of its sister corporations. The amounts in question are significant, and to date unaccounted for despite significant interest and litigation. Debtor's failure to disclose these assets and the intercompany debt owed to it by Hospitality Enterprises, Inc. has not only raised doubts as to the accuracy of debtors' schedules, but also the veracity of management. On more than one occasion debtor's management has represented to the Court that intercompany obligations were not due to the debtor and that a full accounting was underway. At the trial on the merits of these motions, the Court discovered otherwise.

Debtor's management has a history of promoting half truths and opposing legal positions based on the change of circumstances. It has also demonstrated an inability to grasp a basic understanding of corporate hierarchy. Management's relationship with the opposing equity interests is so full of acrimony, that it is highly unlikely that debtor's management could ever work with those who must consent to approve its plan. Six years of litigation has entrenched this impasse.

---

it matures, found to have authority to propose a plan without separate board approval).

Determination of whether appointment of a chapter 11 trustee is in the best interests of creditors entails exercise of a spectrum of discretionary powers and equitable considerations. It must therefore be determined on a case by case basis and will rely heavily on the facts. *Petit v New England Mortg. Services, Inc.*, 182 B.R. 64 (Bankr. D.Me. 1995). In making this determination the court may consider the trustworthiness of the debtor balanced against the costs of the appointment. *Matter of Cajun Elec. Power Co-op, Inc.,* 74 F.3d 599 (5th Cir. 1996), *In re Ionoshpere Clubs, Inc.* 113 B.R. 164 (Bkrtcy. S.D.N.Y. 1990). Additionally, when the board of directors of a debtor corporation is effectively deadlocked, appointment of a trustee is in the best interests of the bankruptcy estate. *Matter of Tahkenitch Tree Farm P'ship*, 156 B.R. 525 (Bankr. E.D. La. 1993). *In re Advanced Electronics, Inc.*, 99 B.R. 249 (Bankr. M.D. Pa. 1989). *In re Petralex Stainless, Ltd.*, 78 B.R. 738 (Bankr. E.D. Pa. 1987); 5 *Collier on Bankruptcy*, ¶ 1104.01 (15th ed. 1993).

While it is always more costly to appoint a trustee, and the appointment will necessarily involve some disruption to the business, in this case the Court does not believe that the additional costs or risk of disruption outweigh the benefits. Without a board to approve a plan, none can be formulated or proposed. Without a plan, this debtor may not emerge from bankruptcy and the creditors can not be paid.

As to the costs of a trustee, the Court notes that the cost to the estate, in legal and accounting fees incurred as a result of the infighting between the controlling shareholders and directors, is also significant. Counsel for the debtor, Whitney, and Unsecured Creditors Committee are all being paid with estate funds. By appointing a trustee, it is believed that these costs will be substantially reduced, if not eliminated.

39

Further, the discovery of additional assets and claims in favor of the debtor, heretofore undisclosed, convinces the Court that a trustee will be ultimately less expensive to the creditors. Because the trustee will be in a position to pursue claims debtor's management shows no inclination to pursue, the recovery to the estate may well be increased.

With a trustee, all interests are assured a neutral party with the best interests of the creditors at heart. Allegations of hidden assets, claims against insiders for preferences or unauthorized payments may be explored and put to rest. Demands against sister corporations for repayment may be made without fear of conflict. Most importantly, all interests in the case, and the Court, can be reassured that full and open disclosure of the debtor's assets will be achieved. The trustee will also function as the board of directors, breaking a certain deadlock and allowing for the completion of the case.

For these reasons, the Court will appoint a trustee.

New Orleans, Louisiana, September 22, 2006.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge